*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0385P (6th Cir.)
File Name: 03a0385p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

THE ANDERSONS, INC.,
  *Plaintiff-Appellant,*

  *v.*

CONSOL, INC.,
  *Defendant-Appellee.*

No. 02-3417

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07290—James G. Carr, District Judge.

Argued: July 31, 2003

Decided and Filed: October 31, 2003

Before: KENNEDY, GILMAN, and GIBBONS, Circuit
Judges.

———————

**COUNSEL**

**ARGUED:** James R. Jeffery, SPENGLER NATHANSON,
Toledo, Ohio, for Appellant. Rodger L. Puz, DICKIE,
McCAMEY & CHILCOTE, Pittsburgh, Pennsylvania, for
Appellee. **ON BRIEF:** James R. Jeffery, SPENGLER
NATHANSON, Toledo, Ohio, for Appellant. Rodger L. Puz,

---

James R. Miller, DICKIE, McCAMEY & CHILCOTE,
Pittsburgh, Pennsylvania, for Appellee.

———————

**OPINION**

———————

KENNEDY, Circuit Judge. Plaintiff The Andersons, Inc.
(plaintiff) appeals the district court's award of summary
judgment for defendant Consol, Inc. (defendant) on plaintiff's
claims of unjust enrichment, promissory estoppel, and
intentional and/or negligent misrepresentation on the ground
that genuine issues of material fact exist to support such
claims. Because we find that, taking plaintiff's factual
allegations as true, no genuine issues of material fact exist to
support any of those claims, we affirm the district court's
award of summary judgment to defendant.

## I. Jurisdiction and Procedural History

Plaintiff filed this action against defendant in the Lucas
County Court of Common Pleas. Defendant removed the
case to the United States District Court for the Northern
District of Ohio based on diversity jurisdiction. Plaintiff's
complaint alleged claims of breach of commitments and
understandings, unconscionable conduct, unjust enrichment,
reasonable reliance/promissory estoppel, and intentional
and/or negligent misrepresentation arising out of the parties'
negotiations for defendant's lease of rail cars from plaintiff.
On January 25, 2002, the district court granted defendant's
renewed motion for summary judgment on all of plaintiff's
claims. Plaintiff appeals the grant of summary judgment only
with respect to its claims of unjust enrichment, promissory
estoppel, and intentional and/or negligent misrepresentation.

## II. Facts

The following is plaintiff's version of the facts in support of its claims. Defendant is currently a publicly-held corporation that mines, processes, and markets coal from various locations throughout the United States. During the relevant period for purposes of this litigation, defendant was a privately-held corporation. Plaintiff is a publicly-held corporation that, among other business activities, sells, leases, and repairs railroad cars.

NationsBank, a lender of plaintiff, notified plaintiff of defendant's need to lease rail cars. On July 21, 1998, plaintiff's representatives met with James Dillon, defendant's employee, to discuss defendant's possible lease of plaintiff's rail cars. Dillon informed plaintiff's representatives that defendant was interested in lease pricing for up to 240 rail cars because defendant wished to bid on a coal requirements contract with Potomac Electric Power Company (PEPCO), which would require defendant to furnish the rail cars necessary for coal transportation. On August 13, 1998, plaintiff sent defendant a lease proposal for 240 rail cars at a rental rate of $395 per rail car per month. On September 2, 1998, per Dillon's request, Thomas Connolly, plaintiff's employee, sent Dillon a copy of plaintiff's standard, full-service lease agreement and rider. In reviewing the lease agreement to determine if it contained any provisions that would affect the coal's transportation, Gerald Rutka, defendant's employee, found none. Rutka used the pricing information in plaintiff's lease agreement to calculate defendant's requirements regarding the lease of the rail cars for the PEPCO bid. In mid-September of 1998, Dillon informed Charles Brown, plaintiff's employee, that defendant had not received the PEPCO bid but that defendant intended to bid on another PEPCO coal contract requiring up to 131 rail cars.

Plaintiff submitted a new lease rate of $389 per rail car per month, which defendant used in formulating its second bid to

PEPCO. In early November of 1998, defendant learned that it had received the PEPCO contract. On November 18, 1998, Dillon sent Brown a letter confirming defendant's intent to lease 131 specified rail cars from plaintiff for a term of six years at a rental rate of $389 per rail car per month, with an option to end the lease after three years. However, in that same letter of intent, Dillon expressly conditioned any such lease transaction upon PEPCO's formal execution of its agreement with defendant, giving rise to defendant's need to lease the rail cars, and "upon the successful negotiation of a definitive lease agreement containing terms and conditions . . . [that] are acceptable to" defendant's senior management. At this point, Dillon still retained plaintiff's standard, full-service lease agreement and rider. Plaintiff began to prepare for placing the rail cars into defendant's service. Dillon declined plaintiff's offer to allow defendant to inspect the rail cars at their storage site in Indiana. Per Dillon's request, plaintiff sent some rail cars to a shop in Altoona, Pennsylvania to repair them before they went into service. Plaintiff also moved some rail cars to various shops throughout Ohio and Pennsylvania.

At defendant's request, plaintiff agreed to allow defendant to inspect the rail cars at the Altoona repair shop. Dillon testified that defendant desired this inspection before the rail cars' repair because PEPCO and defendant were concerned that the rail cars would be in poor condition. On December 11, 1998, plaintiff leased an airplane, flew to Pittsburgh, Pennsylvania to pick up defendant's representatives, and then flew to Altoona. During the inspection, plaintiff first learned that defendant intended to rotary dump the rail cars rather than unload them from the bottom–a process that would require plaintiff to bolt the bottoms of the rail cars shut. Although plaintiff reasonably believed that the rail cars only needed patching, defendant demanded that plaintiff re-sheet the rail cars, a repair which is considerably more expensive than patching. Plaintiff ultimately agreed to bolt the bottoms and re-sheet the rail cars without raising defendant's lease

rate. Because of this work, defendant agreed to extend the lease's start date from January 1, 1999 to March 1, 1999.

While plaintiff and defendant were working through the "mechanical issues" regarding the 131 rail cars, they were negotiating a written lease. On November 23, 1998, Dillon sent plaintiff defendant's requested changes to the standard, full-service lease and rider. On December 10, 1998, after reviewing these proposed changes, plaintiff sent Dillon "a revised lease incorporating a number of those [requested] changes which were acceptable to" plaintiff. Dillon and Connolly spoke over the telephone concerning the December 10, 1998 lease revisions. In mid-December of 1998, defendant learned that the Public Utility of New Hampshire, Bow Terminal, was not renewing its contract with defendant and, consequently, that the 100 rail cars that defendant leased from GATX at the rate of $315 per car per month for coal transportation to the public utility would become available on December 31, 1998. According to plaintiff, when defendant learned that 100 rail cars were available at a cheaper lease rate from GATX, defendant no longer desired to lease the 131 rail cars from plaintiff and, thus, frustrated and then unilaterally terminated its on-going lease negotiations with plaintiff. To accomplish this alleged end, Dillon faxed a letter dated December 18, 1998 to plaintiff stating:

> On two occasions, CONSOL has had phone conversations with The Andersons to elaborate on one another's positions rectifying some points but leaving CONSOL with the impression that The Andersons will not acceptably alter or remove several provisions to which CONSOL *will not agree*.
> If this impression is correct, we need to recognize this fact, part company and go our separate ways. If this impression is not correct, we need to come to agreement by December 24, 1998.

On December 23, 1998, Connolly faxed Dillon a revised version of the lease, incorporating additional changes, but not

all of those that defendant requested. After being unable to reach Dillon to discuss these revisions, Connolly left Dillon a message that the department was closing at noon on December 24, 1998, but provided his home phone number so that Dillon could reach him. On December 24, 1998, after 4:00 pm, Dillon left a message in Connolly's voice mail that a deal no longer existed due to plaintiff's December 23, 1998 version of the lease that left several of its provisions still in dispute. Four of the lease provisions that defendant disputed involved OT-5 approval,[1] tax liability indemnification, property and liability insurance, and change in defendant's ownership. According to plaintiff, defendant fabricated these issues, which should not have been in dispute at all, by misrepresenting and withholding facts so as to "frustrate any reasonable chance to reach agreement between the parties."

### III. Analysis

We review the district court's order granting summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We must believe the non-moving party's evidence, and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Moreover, we must view the inferences that we draw from those underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "material" fact is one "that might affect the outcome of the suit." *Anderson,* 477

---

[1] As a prerequisite to running rail cars on interstate railways, the railroads require that the operators of such rail cars obtain their OT-5 approval, which depends upon the operators demonstrating that they have sufficient track storage capacity for the rail cars when they are idle.

U.S. at 248. A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In diversity cases, the district court is to apply the choice of law rules of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The district court held that Ohio law governs plaintiff's claims. Plaintiff does not appeal this determination.

### A. Unjust Enrichment

To recover for unjust enrichment under Ohio law, a plaintiff must prove that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit "under circumstances where it would be unjust to do so without payment." *Brown-Graves Co. v. Obert*, 648 N.E.2d 1379, 1383 (Ohio Ct. App. 1994). The plaintiff must show that the substantial benefit to the defendant is "causally related" to the substantial detriment to the plaintiff. *Gaier v. Midwestern Group*, 601 N.E.2d 624, 627 (Ohio Ct. App. 1991). In determining whether a defendant received an unjust or unconscionable benefit, we must consider whether "the defendant was the party responsible for the plaintiff's detrimental position." *U.S. Health Practices, Inc. v. Blake*, No. 00AP-1002, 2001 WL 277291, at *2 (Ohio Ct. App. March 22, 2001) (holding that the plaintiff's responsibility for his detrimental position breaks the requisite causal connection between the defendant's benefit and the plaintiff's loss). "The doctrine of unjust enrichment provides an equitable remedy imposed to prevent injustice." *Giles v. Hanning*, No. 2001-P-0073, 2001 WL 1173512, at *2 (Ohio Ct. App. May 31, 2002). Thus, the plaintiff must show enrichment that is *unjust. Id.* It is insufficient for the plaintiff to prove merely that he conferred a benefit upon the defendant. *Katz v. Banning*, 617 N.E.2d 729, 735 (Ohio Ct. App. 1992). Rather, the plaintiff must prove that, under the circumstances, the plaintiff has a "superior equity so that, as against . . . [the

plaintiff], it would be unconscionable for the . . . [defendant] to retain the benefit." *Id.* (internal quotation marks omitted).

Plaintiff claims that genuine issues of material fact exist as to whether: 1) plaintiff conferred the benefit of securing the PEPCO contract on defendant when plaintiff gave defendant a lease rate for 131 rail cars because defendant needed that rate to calculate its PEPCO bid; and 2) plaintiff has superior equity rendering defendant's retention of that benefit unconscionable because defendant had declined plaintiff's request for defendant to inspect the rail cars in Indiana; plaintiff, at defendant's request, sent some of the rail cars to Altoona, Pennsylvania, for repair; plaintiff picked up the defendant's representatives in Pittsburgh in its chartered airplane so that defendant could conduct its requested inspection in Altoona; and, lastly, plaintiff, per defendant's demands, agreed to bolt the bottom of and re-sheet the rail cars without raising defendant's lease rate–an undertaking that cost $78,300.00. In short, plaintiff argues: "Consol took Andersons' lease rate and negotiated a sales contract for coal with PEPCO, then dumped Andersons when it learned it could lease rail cars for a cheaper rate, leaving Consol with a windfall of profit and Andersons with a pile of damages."

Even taking all of plaintiff's factual allegations as true, we find that plaintiff's unjust enrichment claim fails as a matter of law. Assuming *arguendo* that defendant's ability to secure the PEPCO bid were a cognizable benefit that plaintiff had conferred on defendant by giving it a lease rate, plaintiff has not demonstrated the requisite causal connection between this benefit and any alleged detriment to plaintiff. Rather, the only detriment that plaintiff establishes is the expenses that it incurred in preparing to lease its rail cars to defendant; yet, such a detriment stems from defendant's *failure ultimately to enter into a lease agreement with plaintiff*, not from defendant's use of plaintiff's tendered lease rate in its PEPCO bid. If, after plaintiff had incurred these expenses, defendant had actually entered into a lease agreement with plaintiff in executing its PEPCO contract, defendant's use of plaintiff's

lease rate would not have harmed plaintiff. As the requisite causal chain between the alleged benefit that plaintiff conferred on defendant and plaintiff's alleged detriment is absent, plaintiff's unjust enrichment claim necessarily fails. Alternatively, we note that it is hardly unconscionable or "unjust" for a company to secure a third-party requirements contract by using the estimate that a supplier provided without compensating that supplier for such an estimate. *See W.F. Holt Co. v. A&E Elec. Co., Inc.,* 665 S.W.2d 722, 738 (Tenn. Ct. App. 1983) (A subcontractor to which a general contractor did not award a bid is not "entitled to compensation in *quantum meruit* for its efforts in assisting . . .[that] general contractor prepare a price on a negotiated project" because it "would unfairly hamstring general contractors and owners" in their negotiation of contracts and their solicitation of subcontractors' proposals; rather, the subcontractor's efforts are merely an attempt to obtain business and its incurred costs "are merely costs of doing business . . .[that] may or may not result in the subcontractor obtaining the contract.").

### B. Promissory Estoppel

Under Ohio's promissory estoppel doctrine, a promise that the promisor "should reasonably expect to induce action or forbearance on the part of the promisee or a third person and . . . [that] does induce such action or forbearance is binding" if one can avoid injustice only by enforcing the promise. *McCrosky v. Ohio*, 456 N.E.2d 1204, 1205 (Ohio 1983) (adopting Restatement (Second) of Contracts § 90 (1973)) (internal quotation marks omitted). To establish a claim of promissory estoppel, the plaintiff must prove: "[1] a promise, clear and unambiguous in its terms; [2] reliance [on the promise] by the party to whom the promise is made; [3] that the reliance was reasonable and foreseeable; and [4] that the party claiming estoppel was injured by the reliance." *Rigby v. Fallsway Equip. Co., Inc.,* 779 N.E.2d 1056, 1061 (Ohio Ct. App. 2002); *Connolly v. Malkamaki*, No. 2001-L-124, 2002 WL 31813040, at *3 (Ohio Ct. App. Dec. 13, 2002).

As to the first element, plaintiff contends that, as of November 18, 1998, plaintiff and defendant had agreed that defendant would lease from plaintiff 131 specified rail cars at a rate of $389 per car per month, with defendant's ability to end the lease after three years and with the anticipated lease start date of January 1, 1999.[2] In support of this argument, plaintiff simply cites to Dillon's letter of intent, which plaintiff received on November 18, 1998 and which informs plaintiff of defendant's intention to lease the 131 cars under the above-mentioned terms. Revealing the on-going and uncertain outcome of such negotiations, however, Dillon, in that same letter, states that defendant is "in the process of reviewing" plaintiff's lease form and that defendant "will provide . . . [its] comments and suggestions for . . . [plaintiff's] consideration shortly." The intent letter explicitly conditions defendant's entrance into a lease agreement on "successful" negotiation of a "definitive" lease agreement. The word *successful* means "having the desired effect." Webster's Third New International Dictionary 2282 (1986). Thus, the broad and amorphous condition of "successful negotiation" would presumably allow defendant to abandon negotiations if defendant no longer desired to enter into a lease agreement with plaintiff. At that point, any negotiations with plaintiff would no longer have defendant's "desired effect." Moreover, by the letter's express terms, defendant need not have entered into a lease agreement with plaintiff if the proposed lease contained a term or condition that defendant's senior management deemed unacceptable. The word *definitive* means "serving to supply a final answer, solution, or evaluation and to end an unsettled, unresolved condition." Webster's at 592. The condition of a "definitive lease agreement" suggests that defendant's intention to enter into the specified lease agreement, per the intent letter, was

---

[2] Plaintiff argues that defendant promised to *enter into a lease agreement*, not that any lease agreement actually existed; as the district court aptly noted, plaintiff likely makes this novel distinction so as to avoid statute-of-frauds issues.

not yet settled, resolved, or final–it was not, itself, the "definitive lease agreement" towards which the parties were to negotiate. Because defendant's intent letter, at a minimum, is ambiguous as to whether defendant promised to enter into a lease agreement with plaintiff, any such promise is not "clear and unambiguous" for purposes of promissory estoppel.

Presumably, given this conditional, intent-to-lease letter, plaintiff contends that defendant's *conduct* created a genuine issue of material fact as to whether defendant clearly and unambiguously promised to lease 131 rail cars from plaintiff. As evidence, plaintiff asserts that it had to "move the rail cars from storage to rail shops for repair and then into Consol's service" so as to meet the lease's starting date, and that plaintiff, in complying with defendant's demands, used defendant's preferred repair shop and made costly repairs, which plaintiff believed unnecessary. According to plaintiff, this reveals that "Consol did not act as if its promise to lease the rail cars from Andersons was conditional until Consol did not need to consummate the lease with Andersons." Yet, in its brief, plaintiff argues that it relied on defendant's "promise in beginning to prepare the rail cars for lease"–by moving, re-sheeting, and storing the rail cars–and incurred injury via such reliance. However, plaintiff's submission to defendant's demands cannot serve as the requisite clear and unambiguous promise on which plaintiff relied in submitting to such demands in the first place as, following that logic, plaintiff's alleged reliance would precede any such promise. Alternatively, defendant's demands that plaintiff bolt and re-sheet the rail cars and that plaintiff use defendant's preferred repair shop cannot constitute a clear and unambiguous promise that defendant would enter into a lease agreement with plaintiff, especially given the context of the conditional letter of intent expressly disclaiming any such per se promise. Rather, such demands simply reflect that the parties were, in fact, in the process of negotiating toward their possible entrance into a lease agreement. For example, in demanding that plaintiff bolt and re-sheet the rail cars, defendant was

simply setting out the minimum physical requirements that any rail cars must meet for defendant to desire to lease them. Plaintiff had the choice of whether to accommodate defendant's demands so as to generate good will and/or further the execution of any definitive lease agreement.

Plaintiff underscores that defendant sabotaged the parties' lease negotiations so as to avail itself of the lower lease rate from GATX, and that defendant's senior management did not genuinely find the lease's terms unacceptable. This is tantamount to an argument that defendant, in promising to enter into the lease agreement subject only to specified conditions, thereby *promised to negotiate in good faith* and not to fabricate the existence of one of these conditions nullifying such entrance into the agreement. The district court rejected plaintiff's claim of bad-faith negotiations, upon which plaintiff's claim for breach of commitments and understandings hinged, on the ground that plaintiff had not shown that Ohio recognizes such a cause of action and that, in any event, plaintiff's amended complaint did not allege such a claim. Plaintiff did not appeal from the dismissal of that claim. Consequently, we will not entertain plaintiff's promissory estoppel claim sounding in good-faith negotiations, regardless of whatever merits it may have under Ohio law.

Even if we were to construe plaintiff's promissory estoppel claim to be that, per the intent letter, defendant made a clear and unambiguous promise to enter into the lease agreement subject only to specified conditions and that those conditions never, *in fact*, occurred because PEPCO executed its contract and defendant's senior management truthfully found acceptable the lease's contested "terms and conditions," such a promissory estoppel claim would still fail. In incurring preparatory expenses without securing defendant's indemnification, plaintiff could not have reasonably relied on any promise by defendant to enter into a lease agreement subject only to specified conditions given the possibility that defendant's senior management could have genuinely found

unacceptable at least one term or condition that plaintiff would be unwilling to modify.[3]  *See Nilavar v. Osborn*, 711 N.E.2d 726, 737 (Ohio Ct. App. 1998) (concluding that where the defendant made a clear and unambiguous promise to submit a bid of employment to a hospital on behalf of plaintiff and other doctors, plaintiff, as a matter of law, did not reasonably rely on the defendant's submission of the bid given that the "bid might have been rejected"); *CSX Transp., Inc. v. Occidental Chem. Corp.*, 130 F. Supp. 2d 936, 947-49 (S.D. Ohio 2001) (granting summary judgment for plaintiff as no genuine issue of reasonable reliance existed).

## C. Intentional and/or Negligent Misrepresentation

"The law of misrepresentation protects a plaintiff's interest in 'formulating business judgments without being misled by others into making unwise decisions . . . [that] result in financial loss.'" *Carpenter v. Scherer-Mountain Ins. Agency*, 733 N.E.2d 1196, 1205 (Ohio Ct. App. 1999).  To establish a claim for intentional misrepresentation/fraud under Ohio law, the plaintiff must show:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Id.* at 1204 (internal quotation marks omitted) (observing that the existence of fraud is generally a question of fact).  An

---

[3]We note that plaintiff has not alleged and no evidence shows that defendant made a clear and unambiguous promise that defendant would bear plaintiff's preparatory expenses, should the parties fail to execute a definitive lease agreement.

action for fraud/intentional misrepresentation may lie "not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction . . . fully [to] disclose facts of a material nature where there exists a duty to speak." *Textron Fin. Corp. v. Nationwide Mutual Ins. Co.*, 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996).    Under Ohio's distinct claim of negligent misrepresentation,

[o]ne who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (internal quotation marks and original emphasis omitted).  As with a fraud claim, the plaintiff must also show that the misrepresentation on which he justifiably relied was material.  *Gem Sav. Ass'n v. Aqua Sportsman, Inc.*, No. C-910361, 1992 WL 192500, *2 (Ohio Ct. App. Aug. 12, 1992).  Unlike a fraud claim, however, a negligent misrepresentation claim only lies for an affirmative false statement, not an omission.  *Leal v. Holtvogt*, 702 N.E.2d 1246, 1253 (Ohio Ct. App. 1998).

Plaintiff contends that defendant made certain misrepresentations and omissions that "were critical to the lease transactions" between the parties.  Plaintiff clarifies that such misrepresentations were material to the "lease negotiations."  As damages resulting from defendant's alleged misrepresentations and omissions, plaintiff points to its "lost profit or rental income" as well as the costs of travel, "resheeting the rail cars to satisfy . . . [defendant's] requirements, freight and switching to move the rail cars to

the repair facilities, [and] storage . . . of the rail cars as a result of . . . [defendant's] failure to enter into the lease."

First, plaintiff claims that defendant failed to disclose that defendant had received verbal OT-5 approval to run the rail cars on the railroad where the rail cars where to be in service. According to plaintiff, defendant wanted to delete the lease provision that required defendant to obtain such OT-5 approval. Yet, plaintiff took the position that, although plaintiff was responsible for the rail cars' mechanical conditions, only defendant, not plaintiff, was able to demonstrate to the railroad granting OT-5 approval that defendant had track storage capacity for out-of-service rail cars–a necessary requirement for obtaining and retaining OT-5 approval. Plaintiff claims that, in any event, defendant had obtained verbal OT-5 approval from the railroad before defendant unilaterally terminated lease negotiations with plaintiff. However, even assuming that defendant failed to inform plaintiff that defendant had received verbal OT-5 approval where it had a duty to do so, plaintiff's negligent and/or intentional misrepresentation claims concerning such an omission necessarily fail. Plaintiff's intentional misrepresentation claim cannot lie because plaintiff has not shown that *plaintiff* ever relied on defendant's alleged omission concerning OT-5 approval. Per plaintiff's own concession, at issue is defendant's unreasonable refusal "to accept . . . [plaintiff's] proposed lease language concerning OT-5" approval. In essence, plaintiff's intentional misrepresentation claim is not that plaintiff relied on this omission by acting to its detriment, but that defendant acted to plaintiff's detriment in perpetrating this omission so as to frustrate and, ultimately, to terminate negotiations. In other words, because plaintiff would not have done anything differently had defendant disclosed its verbal OT-5 approval, plaintiff could not have detrimentally relied on such an omission. Because it is based on an alleged omission, plaintiff's negligent misrepresentation claim cannot lie. Yet, even if we were to construe plaintiff's negligent misrepresentation claim to allege that defendant affirmatively

misrepresented the unacceptability of the OT-5 provision when it was, in truth, a non-issue, plaintiff's negligent misrepresentation claim must fail since, as explained above, plaintiff has not shown that plaintiff ever relied on such a misrepresentation.

Second, plaintiff cursorily contends that defendant failed "to accept lease provisions similar to [those of] other rail equipment lessors of" defendant. For purposes of plaintiff's negligent and/or intentional misrepresentation claims, we infer from this argument the allegation that defendant misrepresented the unacceptability of such lease provisions. Yet, even taking plaintiff's factual allegations as true, such negligent and/or intentional misrepresentation claims necessarily fail because, as with the OT-5 claim, plaintiff has not shown that plaintiff relied on any of these alleged misrepresentations to its detriment. For example, plaintiff asserts that defendant rejected the lease provision requiring defendant to indemnify plaintiff from any tax liability that plaintiff would suffer due to defendant's use of the rail cars outside of the continental United Stated during the lease term. Plaintiff claims that this dispute was actually a "non-issue" because defendant never intended to use the rail cars outside of the continental United States and defendant had previously agreed to "this same or similar" provision with another rail car lessor. Thus, plaintiff's claim is that defendant acted to plaintiff's detriment by misrepresenting the unacceptability of the tax indemnification provision so as to frustrate and, ultimately, to terminate negotiations. Because plaintiff would not have done anything differently had defendant not misrepresented the unacceptability of the tax indemnification provision, plaintiff could not have detrimentally relied on such a misrepresentation.

Third, plaintiff asserts that defendant misrepresented that it was completely self-insured and failed to disclose to plaintiff that defendant carried commercial property and liability insurance with large deductibles. Defendant objected to the lease provision that required defendant to maintain

commercial property and liability insurance during the lease term. Plaintiff's negligent and intentional misrepresentation claims with respect to either property insurance or liability insurance fail as a matter of law, even assuming, *arguendo*, that defendant misrepresented that it was completely self-insured and that it had a duty to disclose its insurance coverage. *See Blon v. Bank One, Akron*, 519 N.E.2d 363, 367 (Ohio 1988) (A party to a business transaction may have a duty of full disclosure "where such disclosure is necessary to dispel misleading impressions that" a "partial revelation of the facts" created or might have created.) (internal quotation marks omitted).

Concerning defendant's property insurance, plaintiff's intentional misrepresentation claims based on defendant's alleged misrepresentation that it carried no commercial property insurance and defendant's failure to disclose its commercial property insurance must fail because plaintiff did not detrimentally rely on either the alleged misrepresentation or the omission. Because plaintiff's December 23, 1998 version of the lease permitted defendant to self-insure its entire property insurance obligation despite defendant's alleged misrepresentation or omission, plaintiff maintains that the dispute over that insurance provision was a "non-issue." Thus, with respect to the property insurance provision, plaintiff's claim is that defendant, not plaintiff, acted to plaintiff's detriment by misrepresenting and concealing defendant's property insurance coverage so as to frustrate and, ultimately, to terminate negotiations. Because plaintiff would not have done anything differently had defendant not misrepresented or concealed its property insurance coverage, plaintiff could not have detrimentally relied on such a misrepresentation or omission. Plaintiff's negligent misrepresentation claim based on defendant's alleged omission cannot lie. Moreover, plaintiff's negligent misrepresentation claim based on defendant's alleged misrepresentation fails because plaintiff, as explained above, did not detrimentally rely on such a misrepresentation.

Plaintiff's intentional and negligent misrepresentation claims concerning defendant's commercial liability insurance also fail as a matter of law. Plaintiff's intentional misrepresentation claims based on defendant's alleged misrepresentation that it carried no commercial liability insurance and defendant's failure to disclose its commercial liability insurance must fail because plaintiff did not detrimentally rely on either this alleged misrepresentation or omission and, alternatively, neither the misrepresentation nor the omission was material to the lease negotiations. Plaintiff's unsubstantiated assertions that defendant's liability insurance coverage "should have been a factor in lease negotiations" or "could have resolved the parties' dispute" are insufficient to establish plaintiff's requisite reliance. Nowhere does plaintiff contend that it relied on either the misrepresentation or the omission by not modifying the lease's liability insurance provision to permit defendant's existent liability insurance coverage. In fact, the record reveals that the reason, if any, that plaintiff did not modify the liability insurance provision is that it relied on defendant's alleged omission regarding its planned IPO, not on defendant's alleged misrepresentation or omission regarding its liability insurance. Alternatively, because the deductibles on the commercial liability insurance that defendant carried exceeded plaintiff's demanded maximum levels for self-insurance, neither defendant's alleged misrepresentation nor its omission regarding its commercial liability insurance was material to the lease negotiations.[4] Plaintiff's negligent

---

[4] We note that the proper materiality standard for a misrepresentation claim based solely on negotiations is unclear; much of the relevant case law considers materiality in the context of a contract. Defendant contends that the materiality standard set out in *Mulvey v. King*, 39 Ohio St. 491, 494-95 (1883), governs the materiality required for both plaintiff's negligent and intentional misrepresentation claims. In that case, the Ohio Supreme Court held that, to establish materiality in a misrepresentation action involving "a person [who] claims the benefit of a contract into which he has induced another to enter by means of misrepresentations, however honestly made"–an exception to the general rule that a

misrepresentation claim based on defendant's alleged omission cannot lie. As explained above, plaintiff's negligent misrepresentation claim fails because plaintiff never detrimentally relied on this misrepresentation and the misrepresentation was immaterial to the lease negotiations.

Lastly, plaintiff asserts that defendant failed to disclose its planned IPO. Because defendant was in the process of preparing for an IPO, defendant objected to a lease provision rendering any change in defendant's ownership an event of default. According to plaintiff, defendant never informed plaintiff about its planned IPO. Plaintiff contends that, had it known about defendant's planned IPO, it would have modified the liability insurance and default provisions because plaintiff's resultant access to defendant's financial information would have assuaged plaintiff's concerns about defendant's duty to provide plaintiff with such information. Plaintiff's negligent misrepresentation claim based on an alleged omission cannot lie. Plaintiff's intentional misrepresentation claim fails because defendant had no duty to disclose its planned IPO to plaintiff. In *Federated Management, Co. v. Coopers & Lybrand,* the Ohio Court of Appeals underscored that an intentional misrepresentation

---

misrepresentation claim requires actual fraud or gross negligence–, one must only prove that the representation substantially affected "the identity, value or character of the subject-matter of the contract." *Id.* The application of *Mulvey*'s materiality standard to an intentional misrepresentation claim is unclear as *Mulvey* seems to predicate that standard on a negligent misrepresentation claim. In any event, we decline to infer from *Mulvey*, which involves a contract of sale, that its materiality standard applies in the context of negotiations, absent a contract. For purposes of plaintiff's negligent and/or intentional misrepresentation claims, we assume that a misrepresentation is material "if it is likely, under the circumstances, to affect the conduct of a reasonable person with reference to the transaction," including lease negotiations. *See Leal,* 702 N.E.2d at 1253 (internal quotation marks omitted) (an intentional misrepresentation claim grounded in a contract of sale); Webster's Third New International Dictionary 1514 (1971) (The term *negotiation* denotes "a business transaction.").

claim based upon a concealment of fact will lie only if a duty to disclose exists. 738 N.E.2d 842, 854 (Ohio Ct. App. 2000). In particular, the court held that "a duty to disclose arises primarily in a situation involving a fiduciary or other similar relationship of trust and confidence." *Id.* at 855. According to the court, a fiduciary relationship is "a relationship in which . . . [one reposes] special confidence and trust . . . in the integrity and fidelity of another," thereby creating "a position of superiority or influence, acquired by virtue of this special trust." *Id.* Here, plaintiff has failed to show that a fiduciary or similar relationship of trust and confidence existed between plaintiff and defendant. Rather, both plaintiff and defendant were sophisticated companies negotiating at arm's length. We note that defendant may have desired not to disclose its planned IPO to plaintiff for several valid reasons, such as issues of confidentiality or concerns about insider trading. For purposes of the lease negotiations, it was sufficient for defendant simply to have demanded that plaintiff remove the provision rendering any change in ownership an event of default; it need not have divulged the reason underlying that demand.

In sum, we affirm the district court's grant of summary judgment for defendant on plaintiff's claims of unjust enrichment, promissory estoppel, and intentional and/or negligent misrepresentation on the ground that, even taking plaintiff's factual allegations as true, no genuine issues of material fact exist to support such claims. Thus, the district court did not err in granting defendant summary judgment.