NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0375n.06
No. 20-3358

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL GRASSI; CFOM, INC., | ) | **FILED** |
| | ) | Aug 03, 2021 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES |
| | ) | DISTRICT COURT FOR THE NORTHERN |
| JOHN GRASSI; ALOTECH LIMITED, | ) | DISTRICT OF OHIO |
| LLC, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

**BEFORE:  BATCHELDER, GRIFFIN, and STRANCH, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.**  Brothers Michael and John Grassi spent several years working together to develop a manufacturing technology called ablation casting, which was ultimately licensed to Honda.  The brothers now disagree on what role Michael played in the development process, and what payment he may be owed.  Michael Grassi and his company, CFOM, filed suit against John Grassi and his company, Alotech, asserting claims including unjust enrichment, quantum meruit, misappropriation of trade secrets, breach of contract, and promissory estoppel.  Michael alleges that he and his brother John had an oral partnership agreement, and that he is owed a portion of the monies earned from the Honda deal.  Defendants denied the allegations and counterclaimed, including a request for a declaratory judgment that they own the intellectual property claimed by Michael.  At issue there are two intellectual property agreements from 2012 and a patent assignment from 2017, on which Michael claims his signatures were forged.

The district court granted summary judgment to Defendants on all Plaintiffs' claims except breach of contract and promissory estoppel. Trial of those claims resulted in a jury verdict for Defendants. Plaintiffs challenge the court's summary judgment determinations, several key evidentiary rulings, and a portion of the jury instructions. For the reasons stated below, we **AFFIRM** in part and **REVERSE** in part, and **REMAND** for a new trial.

## I. BACKGROUND

### A. Factual Background

Plaintiff Michael Grassi and Defendant John Grassi are twin brothers. In 2002 or 2003, John Grassi's company, Defendant Alotech, patented a technology for casting metal parts called ablation casting. Over the years, Alotech continued to refine the ablation casting process, filed five more patents relating to the technology, listing John Grassi and collaborators as the inventors, and began manufacturing parts for other companies.

In 2006, Michael Grassi and his company, CFOM, began assisting Alotech with certain aspects of the ablation casting process. A few years later, another CFOM employee, Charles Rizzuti, came onboard to help with the computer programming.

According to Michael Grassi, between 2006 and 2012, he and Rizzuti helped make the technology commercially viable by contributing several innovations that sped up the casting process, increased its consistency, and reduced costs. Michael testified that in 2008, he and John agreed to evenly split the monies earned from the ablation casting process. The brothers' mother, Rosemarie Grassi, swore in an affidavit that in 2011, John told her that he and Michael planned to split the profits from their ablation casting project. She also attached a letter she sent to John in May 2019, recounting the conversation in which he told her about the partnership. Rizzuti similarly testified at his deposition that Michael had told him about the deal early in their work together.

In the fall of 2012, Michael contends, John asked him to relocate from Minnesota to Ohio to work on ablation casting at Alotech full-time. Michael agreed to do so. Around the same time, Alotech was negotiating a deal for Honda to license the ablation casting technology to manufacture automobile parts. Michael testified that in September 2012, he and John entered into an oral agreement to split the monies[1] from that deal and future deals, with Alotech/John Grassi receiving 65 percent and CFOM/Michael Grassi receiving 35 percent. Rizzuti testified that Michael told him that he and John had agreed to split the proceeds from the Honda deal.

John Grassi, however, testified that he and Michael never entered into such an agreement. Instead, he claims, Alotech hired Michael as an employee—it issued him a W-2, provided him with an annual salary, and enrolled him in its 401(k) plan.

Defendants also claim that in October 2012, at Alotech's behest, Michael signed a "Confidentiality and Work Product Agreement" (IP Agreement) providing that Alotech would own his work product and any value relating to ablation casting created by CFOM while Michael was "engaged by" Alotech. According to Vicki Hawker, Alotech's administrative assistant, nearly all Alotech employees signed similar agreements at the time, and Alotech's files contained two copies of Michael's agreement, one signed on October 22, 2012, and one signed on October 25, 2012. The documents are essentially the same, but the earlier contract bears the signature of "Michael J Grassi President" on behalf of CFOM and lists an address for CFOM in Somerset, PA, while the later-dated contract bears the signature of "Mike J. Grassi" on behalf of CFOM and lists an address in Duluth, Minnesota. Neither contains initialed pages. Michael testified that at the

---

[1] Defendants contend that Michael has been "inconsistent" about whether the oral agreement concerned the proceeds or the profits of the Honda deal. However, at his deposition, Michael explained that because the Honda deal was a licensing agreement, there were no costs, making the terms "proceeds" and "profits" interchangeable.

time, he was living in Duluth but had a house in Somerset that CFOM had used as its business address at some point. He did not think that CFOM was using the Somerset address as its business address in October 2012, but did not remember for certain and his testimony on the issue was inconsistent. Neither Hawker nor John Grassi claimed they or anyone else witnessed Michael signing the IP Agreements, nor did they explain Alotech's methods for maintaining the integrity of business records. Alotech's counsel, Brett Lockwood, stated in a declaration that on October 25, 2012, he received from Alotech an e-mail attaching nine IP Agreements signed by Alotech employees, including the Agreement of October 25 that was purportedly signed by "Mike J. Grassi."

Michael Grassi agrees that Alotech presented him with the IP Agreement, but maintains that he did not sign it. He did, however, use the same form agreement with an Alotech employee whose services he was engaging for a separate company, called DynoPro. That contract was executed on October 22, 2012; Michael initialed the agreement on every page, signed his name as "Michael J. Grassi," and listed a Danville, Ohio, business address for DynoPro.

Alotech's deal with Honda was finalized in April 2013. Among other things, the licensing agreement provided that Alotech's future intellectual property relating to ablation casting would be the joint property of Alotech and Honda, but it excluded any such property developed by Alotech prior to the date of the agreement. So, as part of the due diligence process, one of Alotech's attorneys, Jay Moldovanyi, worked with John and Michael to develop a list of 22 items of previously developed intellectual property that belonged to Alotech, which Michael reviewed and agreed was accurate. Michael acknowledges that he reviewed that list, but contends he viewed Alotech as being "John and Mike," rather than a separate entity. He explained that he approved the list because John wanted to present all the relevant technology as belonging to Alotech in order

to show Honda they could "pull this off." Moldovanyi stated in an affidavit that he viewed the list as enumerating intellectual property that belonged only to Alotech. However, Moldovanyi had previously represented CFOM and another of Michael's companies on unrelated matters, and Michael testified at his deposition that he believed Moldovanyi was "representing [his] interests" and knew he was "independent of John."

In June 2017, Defendants assert, Michael assigned to Alotech a patent that had previously been filed by him, John Grassi, and another individual. The assignment document (Patent Assignment) bears Hawker's notary seal and signature. Hawker testified at her deposition that she personally witnessed Michael signing the document, and that she was the only person who was present. John Grassi first testified that he did not see Michael sign the document, then later said he had. Michael Grassi contends that his signature on the Patent Assignment was forged.

Later in 2017, Michael approached John to demand that Alotech pay him his share of the monies from the Honda deal. The brothers' relationship deteriorated soon afterwards, and they parted ways. Defendants contend that Michael was fired; Michael contends that he was never an employee.

Over the years, Defendants made hundreds of thousands of dollars in payments to Plaintiffs. The amounts are generally undisputed, but the parties offer differing views of precisely what those payments were compensation for. From 2006 to 2012, Michael Grassi and Rizzuti were reimbursed by John Grassi and/or Alotech for costs and materials relating to their work for Alotech. Some expenses were also covered by third party companies interested in the technology. In addition, CFOM received payments in the amount of $726,000 from 2009 to 2016. Michael Grassi states that these payments were merely reimbursements for costs and materials, and that he has never received compensation for his intellectual contributions to the ablation casting

technology during that time period. John Grassi, disputes this and testified, for example, that he paid Michael $350,000 for "Ablation Valve Control Improvements" in connection with the Honda deal. In addition, from 2012 to 2017, Alotech paid Michael approximately $693,000 for the period 2012 to 2017. Defendants characterize this as salary, but Michael contends the payments were his personal draw from his partnership with John.

###### B. Procedural History

Plaintiffs filed their complaint against Defendants in Ohio state court in October 2018, asserting claims for breach of contract, promissory estoppel, quantum meruit, unjust enrichment, fraud, and misappropriation of trade secrets. After removing this case to federal court based on diversity jurisdiction, Defendants filed an answer and counterclaims against Michael Grassi and CFOM for deceptive trade practices and breach of contract and for a declaratory judgment that Defendants own Alotech, all of Alotech's profits, and certain Alotech intellectual property; counterclaims against Michael Grassi alone for business defamation, conversion, and tortious interference with current and prospective business; and a third-party claim against Rizzuti for a declaratory judgment that neither CFOM nor Rizzuti has a claim to additional monetary payments from Alotech or any ownership stake in Alotech.

On February 5, 2020, the district court granted summary judgment, (1) dismissing Plaintiffs' claims of quantum meruit, unjust enrichment, misappropriation of trade secrets, and fraud; (2) entering a declaratory judgment that Plaintiffs have no legally cognizable ownership interest in Alotech's intellectual property in ablation casting; and (3) entering a declaratory judgment that Rizzuti does not have any claim to additional monetary payments from Alotech or any ownership stake in Alotech. As part of its decision, the district court rejected Plaintiffs' contention that his signature on the June 2017 Patent Assignment and the two IP Agreements had been forged, finding that there was no issue of material fact as to the validity of those contracts.

Defendants voluntarily dismissed their counterclaims for conversion, breach of contract, and declaratory judgment as to the ownership of Alotech and its profits. The case went to trial on the remaining causes of action: Plaintiffs' claims of breach of contract and promissory estoppel, and Defendants' counterclaims for defamation, tortious interference with current and prospective business, and deceptive trade practices. Based on its conclusion at summary judgment that the Patent Assignment and the IP Agreements were valid, the district court barred Michael from testifying that the second IP Agreement was inauthentic. The district court also excluded Trial Exhibit 8, a 2013 e-mail chain relating to the IP Agreements, finding it protected by Alotech's attorney-client privilege.

At the conclusion of the evidence, the district court granted Plaintiffs' motion for a directed verdict on Defendants' three remaining counterclaims and referred the promissory estoppel and breach of contract claims to the jury. The court instructed the jury that Plaintiffs' burden of persuasion on the promissory estoppel claim was "clear and convincing evidence," rejecting Plaintiffs' argument that the applicable standard was "preponderance of the evidence." The jury returned a verdict in favor of Defendants on Plaintiffs' breach of contract and promissory estoppel claims.

Plaintiffs then moved for a new trial and relief from judgment, seeking an evidentiary hearing on their forgery claims as well as vacatur of the district court's order on summary judgment as to the validity of the IP Agreements and the Patent Assignment. The district court denied the motion. It agreed that it had erred in excluding the e-mails as protected by attorney-client privilege, but concluded that any error was harmless because it had already decided as a matter of law that the IP Agreements were valid.

Plaintiffs appeal the district court's (1) grant of summary judgment dismissing their damages claims of quantum meruit and unjust enrichment, their declaratory judgment claim regarding the ownership of intellectual property, and their claim of misappropriation of trade secrets; (2) order excluding evidence relating to the validity of the IP Agreement; (3) order excluding Trial Exhibit 8 and related testimony; and (4) jury instructions regarding their promissory estoppel claim.

## II.    ANALYSIS

### A.    The District Court's Grant of Summary Judgment

We first address Plaintiffs' challenge to the grant of summary judgment, grouping together their claims of quantum meruit and unjust enrichment in one category, and their declaratory judgment claim concerning intellectual property and their misappropriation of trade secrets claim in another category.

The district court's grant of summary judgment is reviewed de novo. *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). Defendants, as movants, bear the burden of making this showing. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020). In examining the record to determine if there is an issue of material fact, we do not judge credibility or weigh evidence; instead, we believe the evidence of the nonmoving parties, and draw "all justifiable inferences" in their favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Ultimately, a genuine dispute exists where "there is sufficient evidence" that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49

Our review of the district court's a grant of partial summary judgment is limited to the evidence before the district court at the time of its ruling, and we do not consider evidence that was later introduced at trial. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

1. Quantum Meruit and Unjust Enrichment

Under Ohio law, unjust enrichment and quantum meruit claims share the same essential elements: "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment." *Meyer v. Chieffo*, 950 N.E.2d 1027, 1039 (Ohio Ct. App. 2011); *see also Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). Because these equitable remedies are intended to "prevent injustice," the third element is critical; it is not enough for a plaintiff to show merely that he conferred a benefit upon the defendant. *Andersons, Inc. v. Consol., Inc.*, 348 F.3d 496, 502 (6th Cir. 2003) (quoting *Giles v. Hanning*, 2002-Ohio-2817, 2002 WL 1173512, at *2 (Ohio Ct. App. May 31, 2002) and citing *Katz v. Banning,* 617 N.E.2d 729, 735 (Ohio Ct. App. 1992)); *see also Liberty Mut. Ins. Co. v. Three-C Body Shop, Inc.*, 2020-Ohio-2694 ¶ 10, 2020 WL 2042916, at *2 (Ohio Ct. App. Apr. 28, 2020). Instead, a plaintiff must show "enrichment that is unjust"—that under the circumstances, the plaintiff has a "superior equity" that makes it "unconscionable for the . . . [defendant] to retain the benefit." *Andersons*, 348 F.3d at 502 (alterations in original) (quoting *Katz,* 617 N.E.2d at 735). To demonstrate this superior equity, "a plaintiff must show that the substantial benefit to the defendant is 'causally related' to the substantial detriment to the plaintiff." *Id.* (quoting *Gaier v. Midwestern Grp.,* 601 N.E.2d 624, 627 (Ohio Ct. App. 1991)); *see also Longmire v. Danaci*, 155 N.E.2d 1014, 1024–25 (Ohio Ct. App., 2020). Damages for an unjust enrichment claim are the amount of the defendant's benefit, while damages for a quantum

meruit claim are the measure of the value of the plaintiff's services, less any damages incurred by the defendant. *Meyer v. Chieffo*, 950 N.E.2d 1027, 1039–40 (Ohio Ct. App. 2011).

Plaintiffs' unjust enrichment and quantum meruit claims rest on their allegations that they performed services and provided intellectual property to Defendants in connection with the development of the ablation casting technology, and that they have not been reasonably compensated for those contributions. The district court found it undisputed that Defendants had paid Plaintiffs approximately $1.3 million for their work on ablation casting, and that nothing in the record suggested this compensation was not "fair value" for the work they did. The district court reasoned that Plaintiffs had "failed to create a genuine issue of material fact as to whether it would be unjust for Defendants to retain the benefit provided by Plaintiffs."

On appeal, Plaintiffs argue that the district court ignored both contradictory evidence indicating that Plaintiffs actually received less than $1.3 million from defendants, and Michael's testimony that any payments were merely reimbursement for costs incurred from 2009 to 2016. According to Plaintiffs, they were never compensated for Michael Grassi's time or intellectual and technological contributions to the ablation casting, particularly his contributions prior to 2009.

This argument is at odds with Michael Grassi's own testimony that the nearly $700,000 he received from Defendants was his draw from the 50/50 partnership with John Grassi. Moreover, Plaintiffs must also offer evidence from which a jury could conclude it was "unjust" for Defendants to retain the benefit of Plaintiffs' time and services. *Andersons,* 348 F.3d at 502. Plaintiffs fail to point to any testimony or documents suggesting that they suffered any detriment, much less a substantial one, as a result of their efforts. When asked at oral argument to articulate the harm they had suffered, Plaintiffs asserted that detriment was "inherent" in their claim that they performed work for Defendants but did not receive compensation for their work. That response,

which echoes the allegations of the complaint, amounts to an argument that Defendants were unjustly enriched "merely [because] [Plaintiffs] conferred a benefit upon" them. *Id.* As *Andersons* and Ohio caselaw make clear, that is not sufficient to make out an unjust enrichment claim. *See id.* Thus, although the evidence cited by Plaintiffs on appeal might raise factual questions about the amount of money Plaintiffs received from Defendants and the purpose of those payments, it does not ultimately create a genuine issue of material fact as to whether it would be unjust for Defendants to retain the benefit provided by Plaintiffs. On this record, no reasonable jury could find for Plaintiffs on their unjust enrichment and quantum meruit claims, and summary judgment was appropriate.

2. Misappropriation of Trade Secrets and Ownership of Intellectual Property

In Count VI, misappropriation of trade secrets, Plaintiffs allege that Defendants licensed the ablation casting technology Plaintiffs had developed without their consent. Defendants counterclaimed for a declaratory judgment that Alotech owns all the intellectual property in ablation casting that it uses in its business and sells to third parties. The district court granted Defendants' motion for summary judgment on both claims, concluding that the IP Agreement and the Patent Assignment established beyond dispute that Plaintiffs have no legally cognizable ownership right in the intellectual property at issue. Michael Grassi's testimony that his signature had been forged, the district court explained, was "self-serving" and uncorroborated by other evidence, and could not create an issue of material fact as to the agreements' authenticity and validity.

A plaintiff may properly demonstrate an issue of fact by pointing to a wide range of materials, including depositions and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "A court may not disregard evidence merely because it serves the interests of the party introducing it." *Harris v.*

*J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (citing *Niemi v. NHK Spring Co.*, 543 F.3d 294, 300 (6th Cir. 2008) ("[Plaintiff's] affidavit, albeit arguably self-serving, is not 'no evidence.'" (alteration in original))); *see also Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020). Michael's specific and repeated sworn deposition testimony that the signatures were forged (*see, e.g.*, R. 24-2, PageID 432–34)—uncontroverted by prior or subsequent statements or actions—is therefore sufficient to create a question of fact as to the authenticity of the Agreements. *See Harris*, 627 F.3d at 239; *Churchwell v. Bluegrass Marine, Inc.,* 444 F.3d 898, 904 (6th Cir. 2006) ("Plaintiff's testimony creates sufficient evidence to create a genuine issue of material facts[.]")  This is so even though the testimony came from Michael Grassi himself.  Further, that testimony was corroborated by Rizzuti, who testified Michael told him that both the IP Agreements and the Patent Assignment were forged.  (R. 24-6, PageID 1183–84)  Defendants urge us to disregard this testimony because Rizzuti offered it only after this lawsuit was filed.  It is not our role, however, to gauge the value of a witness's testimony; we merely ask whether a reasonable jury could find the evidence as a whole to be sufficient to render a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248.

The district court relied heavily on four other pieces of evidence that it determined weighed conclusively in Defendants' favor.  First, the court relied on the notarized 2017 Patent Assignment.  But though a notarized document is "self-authenticating" and presumed to be admissible, *see* Fed. R. Evid. 902(8), nothing in the Rule suggests it is unassailable.  Despite the presence of a notary seal, a reasonable jury may find an acknowledged signature to be forged based on other evidence in the record.  Defendants offered conflicting testimony on the circumstances of the signature.  Hawker testified specifically that she was the only person who saw Michael sign the document and that no one else was near her desk at the time.  (R. 24-5, PageID 1124)  John Grassi, however,

first claimed that he was not in the room while Michael signed, then changed his mind, testifying that he had in fact witnessed the signing after Hawker "beckoned [him] over." (R. 24-4, PageID 908) From this disputed evidence, a reasonable jury might find Hawker's testimony that she witnessed Michael Grassi signing the document not credible. And that finding might in turn cast doubt on the authenticity of the Patent Assignment. Of course, a reasonable jury might also find the notary stamp to be compelling, and Michael's account of forgery unbelievable. But it is for the jury to weigh that evidence and assess credibility; it is not the province of the court. *Anderson*, 477 U.S. at 255.

Second, Michael Grassi admitted that he offered a DynoPro employee a copy of the IP Agreement and signed that agreement on October 22, 2012, the same day Defendants claim he executed the Agreement with Alotech. The district court interpreted this as evidence that Michael in fact signed the IP Agreement offered by Alotech. But this evidence necessarily proves only that Michael was presented with the Agreement on or before October 22, 2012—something he does not dispute. Moreover, Michael signed the DynoPro agreement as "Michael J. Grassi" and initialed every page; other documents offered by Hawker as exemplars also bear the signature of "Michael J. Grassi." (R. 24-7, PageID 1239–43; R. 24-3, PageID 671) In contrast, the October 25 copy of Defendants' Agreement is signed by "Mike J. Grassi," the October 22 copy is signed by "Michael J. Grassi President," and neither copy contains initialed pages. A reasonable jury might conclude from these discrepancies that the IP Agreements were forged.

Third, the district court was also persuaded by the affidavit of one of Alotech's attorneys, who stated that on October 25, 2012, he received from Alotech an e-mail attaching an image of the October 25 IP Agreement signed by "Mike J. Grassi," along with similar executed agreements from eight other individuals. (R. 36, PageID 1537; R. 24-8, PageID 1266) That statement is

corroborating evidence of Defendants' position—that multiple Alotech employees signed those agreements on October 25—but it does not establish beyond dispute that Michael Grassi himself signed the Agreement that was included in the email.

Fourth, the district court determined that Michael Grassi's failure to object to the licensing agreement with Honda—which described various pieces of technology as Alotech intellectual property, including intellectual property that Michael claimed he developed—contradicted his claim that he did not sign away that intellectual property. But Michael testified that he agreed to the list in order to assure Honda that Alotech owned what it was licensing and that there were no potential title issues as to the underlying technology. (R. 24-2, PageID 372, 383–84, 395, 441–44) He further testified that he viewed Alotech as belonging to both himself and John Grassi, (R. 24-2, PageID 439–40, 443–44; R. 24-13, PageID 1368), a claim supported by the affidavit of the brothers' mother that John Grassi told her in 2011 that he and Michael planned to split evenly the profits from their ablation casting project. (R. 26-1, PageID 1458) Rizzuti also testified at his deposition that Michael had told him about the 50/50 deal early in their work together, and informed him around the time of the Honda deal that the split had been modified to 65/35, with Rizzuti to receive 40 percent of Michael's share. (R. 24-6, PageID 1157, 1159, 1179–81) A reasonable jury might therefore accept Michael's explanation that in approving the list, he did not believe he was signing away his intellectual property because he believed he had a stake in Alotech. Additionally, although the attorney who worked on that list on behalf of Alotech, Jay Moldovanyi, averred his belief that it enumerated items of intellectual property that had been developed by Alotech and belonged to Alotech, Moldovanyi had previously been engaged to represent CFOM and another of Michael Grassi's companies on unrelated matters. (R. 24-9, PageID 1277–78) Michael testified at his deposition that he believed Moldovanyi was

"representing [his] interests" and knew he was "independent of John," statements that a jury could find pertinent to Michael's lack of objection to the licensing agreement. (R. 24-2, PageID 456)

The record makes clear that there are substantial issues of material fact as to whether Michael Grassi's signatures on the IP Agreements and the Patent Assignment were forged. In concluding those signatures were authentic despite the evidence to the contrary, the district court resolved factual questions that belong in the domain of the jury. We therefore reverse the district court's grant of summary judgment to Defendants on Plaintiffs' claim of misappropriation of trade secrets and on Defendants' counterclaim for declaratory judgment regarding ownership of intellectual property. These issues are remanded for further proceedings.

**B.    Challenges to Decisions at Trial**

1.    Exclusion of Trial Exhibit 8 and Michael Grassi's testimony regarding Trial Exhibit 59

We review for abuse of discretion the district court's evidentiary rulings and subsequent denial of Plaintiffs' motion for a new trial based on those rulings. *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509–10 (6th Cir. 2013). An abuse of discretion is established if the district court applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact. *Id.* But we reverse "only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Lyngaas v. Ag*, 992 F.3d 412, 430–31 (6th Cir. 2021) (quoting *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005)).

The abuse of discretion standard also applies to a district court's application of the law-of-the-case doctrine. *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002). Under that doctrine, a court's ruling should "continue to govern the same issues in subsequent stages of the same case" in the absence of "extraordinary circumstances such as where the initial decision was

'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–17 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).

The district court barred Plaintiffs from introducing two categories of evidence based on its decision at summary judgment that the IP Agreements were valid, which it deemed to be the law of the case. Specifically, it instructed the jury to disregard Michael Grassi's testimony that the IP Agreements were inauthentic and then affirmed that ruling in denying Plaintiffs' motion for a new trial. The court also excluded, on the ground of attorney-client privilege, a chain of e-mails among Alotech employees and Michael Grassi. In those e-mails, Alotech's counsel, Brett Lockwood sent John Grassi a proposed "contractor work product agreement for CFOM," very similar in form and content to the 2012 IP Agreements, but that purportedly addressed "work that is done for Alotech that is paid for by Alotech" and did not address the licensing of technology "that Mike regards as belonging to CFOM." John Grassi forwarded the e-mail chain and attachment to Michael, who responded that it was "more in tune with what [he] would sign."

Upon Plaintiffs' motion for a new trial, the district court acknowledged that it had incorrectly designated the chain as privileged but reasoned that the error was harmless because it had already decided that the IP Agreements were valid, which established that the exhibit was not relevant to any triable issues.

As we have explained, in ruling at the summary judgment stage that the IP Agreements and the Patent Assignment were valid, the district court engaged in factfinding that should have been referred to the jury. That was an error of law, and the district court's evidentiary rulings rested on that infirm ground. In instructing the jury to disregard Michael Grassi's testimony and in excluding Trial Exhibit 8, the district court abused its discretion.

We next ask whether that abuse of discretion affected Plaintiffs' substantial rights. Plaintiffs' claims of breach of contract and promissory estoppel rested on their allegations that the parties had entered into an agreement to split the profits of the ablation casting technology, but Defendants never paid Plaintiffs their share. The court specifically instructed the jury that Plaintiffs "ha[d] no legally recognizable ownership interest in any of the intellectual property that [D]efendant Alotech is using in its business . . . in connection with ablation casting" and that the IP Agreements and Patent Assignment were "valid and enforceable." Thus, Defendants were able to counter Plaintiffs' evidence that they "made valuable contributions to Alotech's process" by using the court's evidentiary rulings to argue that "whatever contributions were made were owned by Alotech under the [IP Agreements]." The court's erroneous exclusion of Trial Exhibit 8, a chain of e-mails among Alotech employees and Michael Grassi, denied Plaintiffs the opportunity to provide evidence to the jury in support of Michael Grassi's claim that the IP Agreements were forgeries.

Defendants also argued generally that Michael Grassi's testimony on the details of the partnership agreement was self-serving and constantly changing, exhibiting a "willingness . . . to change his story, to make up events, to do or say anything to try to get what he wants in this case." They bolstered this narrative by taking advantage of the emails' exclusion to impeach Michael: when Michael cited the email chain as evidence of the oral partnership agreement, Defendants questioned him as to why he had not presented the chain to the jury.

The jury ultimately returned a verdict in favor of Defendants. But additional testimony and documents suggesting that the IP Agreements were forged might well have led the jury to reach the opposite conclusion. Such evidence would have undermined Defendants' argument that a partnership between the brothers was implausible given that Michael had already signed over to

Alotech the intellectual property he contributed; it would also have impacted the jury's view of Michael's and John's credibility. In light of these possibilities, we conclude that because the district court's errors impacted the outcome of the trial, the errors affected Plaintiffs' substantial rights and were not harmless. We accordingly reverse the judgment and remand for a new trial.

### 2. Promissory Estoppel Jury Instruction

Finally, Plaintiffs argue persuasively that the district court erred in instructing the jury to apply the clear and convincing evidence standard to Plaintiffs' promissory estoppel claim, rather than the ordinary preponderance of the evidence standard. However, because we remand for a new trial on that claim based on the district court's evidentiary rulings, we need not and do not reach the merits of this challenge.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment dismissing Plaintiffs' unjust enrichment and quantum meruit claims. We **REVERSE** the court's grant of summary judgment on Plaintiffs' misappropriation of trade secrets claim and Defendants' counterclaim for declaratory judgment regarding the ownership of intellectual property, **REVERSE** the court's judgment after trial on Plaintiffs' breach of contract and promissory estoppel claims, and **REMAND** for a new trial.