NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0092n.06
Filed: February 8, 2005

Nos. 03-5137, 03-5213

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GENERAL ELECTRIC COMPANY, a )
New York Corporation, through its GE )
Appliance business component, )
    Plaintiff-Appellee, Cross-Appellant, )
    )
GE INFORMATION SERVICES, INC., )   ON APPEAL FROM THE UNITED
    Plaintiff-Appellee, Cross-Appellant, )   STATES DISTRICT COURT FOR THE
    )   WESTERN DISTRICT OF KENTUCKY
MABE, S.A., )
    Plaintiff-Appellee, )
v. )
    )
LATIN AMERICAN IMPORTS, S.A., dba )
LATAM, )
    Defendant-Appellant, Cross-Appellee, )
    )
GUILLERMO GONZALES NEUMANN, )
    Defendant-Appellant, Cross-Appellee, )
    )
PERUSPHERE, S.A., )
    Defendant-Appellant, Cross-Appellee. )
    )

Before: COLE and ROGERS, Circuit Judges; COHN, District Judge.[*]

**ROGERS, Circuit Judge.** This appeal arises from a contract dispute between Defendant-

Appellant/Cross-Appellee Latin America Imports, S.A. ("Latam"), and Plaintiff-Appellee/Cross-

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

1

Appellant General Electric Company ("GE"). GE sued to recover on a debt owed by Latam, which distributed GE products in Peru. Latam counterclaimed, alleging that GE fraudulently induced it to enter a distributorship contract by making false promises not to form a similar relationship with Plaintiff-Appellee Mabe, S.A.[1] The district court granted GE summary judgment on the fraud in the inducement counterclaims; Latam appeals this decision here. GE prevailed, after a jury trial, in its action to recover the debt. Because Latam could not have justifiably relied on GE's promise, we affirm the grant of summary judgment.

Latam, a Peruvian importer of household appliances, distributed GE products in Peru for seven years. In 1991, GE and Latam entered an initial distribution agreement for one year. Then, the two companies entered three successive two-year distribution agreements. The parties entered their fourth and last agreement on July 25, 1996, and it expired on December 31, 1998 (the "1996 agreement"). J.A. at 87–97. The 1996 agreement provided that Latam would serve as a non-exclusive distributor of GE products in Peru, and that either party could decline the other's request to renew the agreement. J.A. at 64–65, 72.[2] An integration clause provided that neither party could

---

[1]Latam argued on appeal that the court should remand this case to the district court because the district judge erred in denying Latam's motion to compel Mabe to answer Latam's complaint and to make its mandatory initial disclosures. Appellant's Br. at 42. We do not address this argument here, because counsel for Latam expressly waived this issue at oral argument.

[2]The agreement stated that the amount of credit GE would extend to Latam for the purchase of GE products was in GE's absolute discretion. J.A. at 65. The distributorship agreement was "non-exclusive and non-assignable," with one exception not relevant here. *Id.* at 71. It provided that Latam released GE from "all claims . . . relating to the distribution of the Product(s) as of the date of execution . . ., except indebtedness which may be owing and claims (a) founded upon a written contract, and (b) under written warranties and cooperative advertising and product service plans . . . ." *Id.* at 73.

enforce "[a]ny representations, terms or conditions relating to or in connection with [the distributorship] and not incorporated herein. . . ." J.A. at 72.

When the 1996 agreement expired in 1998, GE decided not to renew. Instead, GE entered into a Peru distributorship relationship with its partially-owned subsidiary, Mabe. J.A. at 163. Latam alleges that GE's transfer of the Peru distributorship to Mabe represented the culmination of a plan on GE's part to defraud Latam. J.A. at 165. Sometime before the formation of the 1996 agreement, Latam alleges, GE and Mabe "decided to take steps to appropriate the Peruvian market from the hands of [Latam] and divert the Peruvian market to Mabe while also disabling Latam and ensuring that it could not affiliate with another American manufacturer." *Id.* Latam maintains that GE did not disclose this intention to Latam, but that, on the contrary, GE assured Latam that GE would retain Latam as a distributor unless Latam gave GE good cause to terminate the relationship. *Id.* Further, when Defendant-Appellant/Cross-Appellee Guillermo Gonzales Neumann ("Gonzales"), the president of Latam, pressed GE executive Robert Reid for assurances that GE would not make Mabe a GE distributor in Peru, Reid allegedly promised Gonzales that Mabe would not be authorized to distribute GE products in Peru. J.A. at 469. Other GE executives allegedly made similar representations. *Id.*

On February 16, 1999, after the termination of the parties' 1996 distributorship agreement, GE sued Latam in the United States District Court for the Western District of Kentucky to recover on a debt. In 1992, Defendant-Appellant/Cross-Appellee Guillermo Gonzales Neumann ("Gonzales"), the president of Latam, had executed a personal guaranty for the debt he would incur purchasing GE products on credit. *See* J.A. at 77–78. GE increased Latam's line of credit over the

3

course of their seven-year relationship. *See* J.A. at 626–627. GE contended that Latam owed it $214,693.57 when the 1996 agreement expired. J.A. at 57. Its amended complaint alleged that Latam was in default under the distributorship agreement. *Id.* at 83. The prayer for relief demanded not only the sum owed, but also a declaration that the 1996 distributorship agreement did not require GE to renew its relationship with Latam. *Id.* at 84.

In August 1999, before any significant progress in the litigation GE had initiated in Kentucky, Latam sued GE, Mabe, and Plaintiff-Appellee/Cross-Appellant GE Information Services, Inc. ("GEIS"), in the United States District Court for the Southern District of Florida. Upon GE's motion, the Florida case was transferred to the Western District of Kentucky and consolidated with GE's action; Latam's claims became counterclaims. Latam's second amended complaint, filed in the Western District of Kentucky, averred fourteen counts based on various legal theories. Five of the counterclaims alleged fraud. The fraud counterclaims were based substantially on Latam's allegation that GE promised before the formation of the 1996 agreement to continue its distributorship arrangement with Latam absent good cause to terminate. The complaint alleged that GE had a present intention not to adhere to this promise when GE made the promise; further, Latam suffered loss in reliance on the promise. J.A. at 165–66. In defending against GE's motion for summary judgment, Latam argued an additional fraud ground: during the negotiations for the 1996 agreement, GE executives allegedly reassured Gonzales that the company had no plan to transfer the Peru distributorship to Mabe, even though such a plan allegedly did exist.[3] J.A. at 469. The

---

[3]Latam's second amended complaint does not allege fraud based on GE's affirmative representation that it had no plan to contract with Mabe. Because Latam argued this theory in defending against summary judgment, however, we may nonetheless consider it. *See Strouss v. Mich. Dep't of Corr.,* 250 F.3d 336, 345 (6th Cir. 2001).

4

district court granted summary judgment to GE on each fraud counterclaim except one.[4] After a jury trial, GE prevailed in its action to recover the debt owed by Gonzales and Latam. J.A. at 222. Latam timely appealed the court's grant of summary judgment on the fraud counterclaims.

In granting summary judgment, the district court concluded that Latam's fraud counterclaims relied on two alleged misrepresentations: a promise to continue contractual relations with Latam unless Latam gave good cause for termination, and a promise not to make Mabe a GE distributor. J.A. at 197. The court found that the fraud counterclaims actually alleged fraud in the performance, not fraud in the inducement, and therefore were barred by the Florida law "economic loss rule." It is unclear whether this application of the economic loss rule accurately reflects Florida law. Nonetheless, Latam's fraud counterclaim concerning GE's promise not to enter a distributorship with Mabe[5] lacks legal basis on another ground: construing the facts most favorably to Latam, Latam did not establish that it justifiably relied on GE's alleged fraudulent comments.

---

[4]This claim alleged that GE falsely promised Latam that GE would grant Latam a long-term exclusive distributorship if Latam invested in the products of a subsidiary company, GE-Dako. The district court denied both summary judgment and, after the claim was tried to a jury, judgment as a matter of law. The jury subsequently found for GE on this claim. GE cross-appealed the district court's denial of judgment as a matter of law on the GE-Dako fraud claim. GE noted at oral argument that it cross-appealed only because it was unclear whether Latam's appeal encompassed the jury verdict on the GE-Dako claim. The appeal is moot, since judgment was entered in favor of GE. *See Smith v. Diffee Ford–Lincoln–Mercury, Inc.,* 298 F.3d 955, 962 (10th Cir. 2002).

[5]Latam has abandoned on appeal its contention that GE promised it a distributorship terminable only for cause. Latam's brief raises only GE's promise not to enter a distributorship with Mabe as the source of GE's fraud; further, Latam counsel stated at argument that Latam's fraud claim was based only on the promise concerning Mabe. Therefore, we address the latter as the only basis for Latam's fraud in the inducement claim.
In addition, Latam does not raise on appeal one of the four claims on which summary judgment was granted, an alleged conspiracy to defraud Latam on the part of GE, Mabe, and GEIS. J.A. at 168. This claim is therefore forfeited.

The parties agree that Florida law governs Latam's fraud claims. A federal court sitting in diversity is bound by the decisions of the state's highest court. *Comm'r of Internal Revenue v. Bosch,* 387 U.S. 456, 465 (1967). The federal court should disregard decisions of lower state courts only if it is "convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* This court reviews de novo the district court's grant of summary judgment. *Andersons, Inc. v. Consol, Inc.,* 348 F.3d 496, 501 (6th Cir. 2003). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The district court correctly determined that Latam's claims of fraud in the inducement failed as a matter of law. A plaintiff must establish the following elements in order to prevail on a fraud claim under Florida law: "(1) a false representation as to a material fact, (2) the defendant actually knew or should have known that the representation was false . . . , (3) the plaintiff reasonably and actually relied upon the representations, (4) the plaintiff incurred foreseeable damages, (5) caused by the defendant's representations." *Tew v. Chase Manhattan Bank, N.A.,* 728 F. Supp. 1551, 1564 (S.D. Fla. 1990). The district court decided that because the alleged fraudulent inducements pertained to future action furthering the distributorship, they in effect formed a "term of performance" of the agreement. J.A. at 203 (quoting *Bankers Mutual Capital Corp. v. United States Fidelity & Guaranty Co.,* 784 So.2d 485, 489 (Fla. Dist. Ct. App. 2001)). Therefore, the district court held, the economic loss rule barred the fraud claims.

6

The economic loss rule may be inapplicable here. The rule provides that where parties freely enter a contract and the promisor fails to perform an obligation "interwoven with the breach of contract," the promisee's claim arises only in contract and no action for fraud in the inducement can lie. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1240 (Fla. 1996) (quoting *Huron Tool & Eng'g Co. v. Precision Consulting Svces., Inc.,* 532 N.W.2d 541, 545 (Mich. Ct. App. 1995)). On the other hand, when the promisor makes a false promise "extraneous to the contract," which, rather than forming a term of performance, induces the promisee to enter the contract, then the rule does not bar his claim. *Id.* (quoting *Huron Tool,* 532 N.W.2d at 545). GE's alleged promise not to enter an agreement with Mabe may be extraneous to the 1996 distributorship agreement, since the pre-contracting promise exhibits tension with the agreement, rather than merely supplementing its terms. *Cf. Hotels of Key Largo, Inc., v. RHI Hotels, Inc.,* 694 So.2d 74, 78 (Fla. Dist. Ct. App. 1997) (finding fraud to be interwoven with the performance of a contract, where the fraud involved a hotel chain's pre-contracting promise regarding how quickly an independent hotel would benefit from the contracted-for reservation listing service). For this reason, it is difficult to predict whether the Florida Supreme Court would apply the economic loss rule in this context.

It is unnecessary to decide this case on the basis of the economic loss rule, however, because Latam's reliance on GE's promise not to grant a Peru distributorship to Mabe was unjustifiable. In some Florida fraudulent inducement cases, the third fraud element, justifiable reliance, is not met as a matter of law. There is some apparent tension in the Florida cases as to whether reliance is unjustifiable only when there is an overt contradiction between a pre-contracting oral misrepresentation and a term of the subsequent written contract, or whether reliance is also unjustifiable when the contract merely fails to include the terms of the oral promise. *Compare*

7

*Wilson v. Equitable Life Assurance Soc. of the United States,* 622 So.2d 25, 28 (Fla. Dist. Ct. App. 1993) (citing *FDIC v. Hemmerle,* 592 So.2d 1110 (Fla. Dist. Ct. App. 1991)) (holding that a party "cannot maintain an action in fraud if the alleged misrepresentation is explicitly contradictory to a specific and unambiguous provision in a written contract"), *with Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib. Ctr.,* 513 So.2d 1303, 1306–7 (Fla. Dist. Ct. App. 1987) (finding that a plaintiff may not rely on a pre-contracting promise not contained in the terms of a subsequent negotiated agreement).

This case is closer to *Saunders* than to *Wilson*, and therefore it is more appropriate for us to apply the "not in the contract" rule of *Saunders* than *Wilson*'s "direct conflict" rule. Latam was unjustified in relying on GE's oral promises not to grant a distributorship to Mabe because the 1996 distributorship agreement did not contain this term. In *Wilson,* a Florida appeals court held that an insurance agent's assertion of pre-contracting promises regarding his salary and retirement pension did not directly conflict with his employment contract, which had "no explicit language discussing or foreclosing" the oral misrepresentation. 622 So.2d at 27. Therefore the fraud claim could proceed. In choosing a "direct conflict" rule, the *Wilson* court distinguished *Saunders* on the grounds that *Saunders* involved a negotiated commercial lease, whereas the employment contract at issue in *Wilson* contained boilerplate terms. *Id.* at 28. Here, as in *Saunders*, Latam had the benefit of arm's-length negotiation of the distributorship agreement. By its own admission, Latam complained to GE that the parties' 1992 distributorship agreement did not make Latam GE's exclusive dealer in Peru. J.A. at 146. Nonetheless, such a term did not appear in the subsequent contracts. Given that Latam had the opportunity to bargain for inclusion in the distributorship

8

agreement of either an exclusivity clause or the promise regarding Mabe, Latam's reliance on GE's pre-contracting promise was unjustifiable as a matter of law.

Even under the more restrictive "direct conflict" rule, Latam's fraud claims may fail, because a pre-contracting promise by GE not to grant Mabe a distributorship contradicts the non-exclusivity clause of the parties' agreement. In *Barnes v. Burger King Corp.,* 932 F. Supp. 1420 (S.D. Fla. 1996)*,* a federal district court applying Florida law found a direct conflict between a restaurant chain's pre-contracting promise to a potential franchisee, and a subsequent franchise agreement. The franchise agreement did not "in any way grant or imply any area, market or territorial rights," and it contained an integration clause. *Id.* at 1427. A pre-contracting letter, on the other hand, stated that the chain had a "good faith policy" of not approving other franchises within two miles of an existing restaurant "absent extenuating circumstances." *Id* at 1423. Arguably, the pre-contracting statement did not create or imply a territorial right, but instead merely made a more specific representation about the limited circumstances in which the chain would choose to place a new franchise near an existing one. Nonetheless, the franchise agreement absolved the chain of its duty to adhere to its pre-contracting promise, and in this respect the agreement and the promise could be viewed as contradictory. The court found that, because a direct conflict existed, the franchisee's reliance on the pre-contracting promise was unjustifiable. *Id* at 1428. Here, similarly, GE's alleged oral promises not to deal with Mabe were more specific than the contract's non-exclusivity clause. Nonetheless, just as the franchise agreement deprived the franchisee of territorial rights in *Barnes*, the distributorship contract in this case put Latam on notice that GE was not bound by an exclusivity obligation. Both this case and *Barnes* are thus distinguishable from *Wilson,* where the court found the plaintiff to be reasonable in relying on promises concerning his

employment benefits package because the boilerplate employment contract simply did not address this subject.  *See* 622 So.2d at 28.

Latam has failed to make out a prima facie case of fraud in the inducement.  Latam was unjustified in relying on GE's pre-contracting promise not to deal with Mabe, both because the promise did not form a term of the 1996 distributorship agreement, and  because the promise was in tension with the 1996 agreement's non-exclusivity clause.

Therefore, the judgment of the district court is AFFIRMED.