NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0145n.06

Case No. 21-3811

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 06, 2022
DEBORAH S. HUNT, Clerk

KENT ARETT,

    Plaintiff-Appellant,

v.

GARDENS ALIVE FARMS LLC, et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

Before: GUY, THAPAR, and READLER, Circuit Judges.

THAPAR, Circuit Judge. Kent Arett saved his company money, so he thought he was entitled to a bonus. But he failed to follow the procedures he agreed to follow. When the company denied him the bonus, he sued. The district court granted summary judgment. We affirm.

I.

Kent Arett was an executive at Gardens Alive, an Ohio direct-marketing company that sells horticultural products. Before he joined the company, Arett enjoyed a career turning around companies by cutting costs. He hoped to do the same at Gardens Alive.

A few years after starting, Arett was ready to slow down. So he approached the company's CEO, Eric Hamant, about a "phased retirement." R. 27, Pg. ID 723. Arett wanted to reduce his hours to three-quarter time. Hamant agreed.

A month later, Felix Cooper—the vice president and COO of Gardens Alive—approached Arett about cutting his salary in half. But Arett refused to accept a lower base salary unless they reduced his hours and modified his bonus structure. Specifically, he wanted his bonus to reflect incentives for completing projects that saved the company significant money.

Negotiations ensued and eventually Cooper emailed Arett an offer letter memorializing the details of their agreement. The letter referenced Arett's reduced hours and noted that his existing bonus structure would be replaced with a "variable bonus based on agreed upon results and deadlines." R. 27-8, Pg. ID 903. But it didn't outline the exact bonus structure. Rather, it explained the details would be provided "under separate cover." *Id.*

In the body of the offer-letter email, Cooper said he was "agreeable" to the following formula for calculating the bonus: 10% bonus calculated on the "first year savings" times three. R. 27-9, Pg. ID 905. Equipment costs and Arett's compensation for his time on the projects would be subtracted before calculating the bonus. The email also detailed the particular projects on which Arett would work.

But the email excluded one relevant input: a way to gauge "first year savings." Instead, Cooper said he would look to Arett for an "initial proposal" on the "key metrics" used for the savings calculation. And Cooper said he was confident the two of them could work out "in good faith" the details of "how that calculation will be made." R. 27-9, Pg. ID 905.

Arett responded to the email with two words: "I agree." R. 27-9, Pg. ID 904. But he never submitted an initial proposal on the key metrics. Nor did Arett ever bring up a bonus again—that is, not until after he was fired almost a year later.

After his termination, Arett asked about his bonus. Cooper offered him a little over $12,000, about 11.5% of his annual salary. Arett wasn't happy with the offer; he believed he'd

saved the company over $3 million that year alone. Thus, he thought he was entitled to a more-than-$500,000 bonus under the formula in Cooper's email. But Gardens Alive disagreed, believing the parties had not reached a meeting of the minds on the bonus structure.

Having reached an impasse over his bonus, Arett sued Gardens Alive in federal court for age discrimination, breach of contract, promissory estoppel, and unjust enrichment. The district court granted Gardens Alive summary judgment on all claims. Arett appeals all but his age-discrimination claims. The parties agree that Ohio law applies to the remaining claims.

## II.

Start with breach of contract. Arett argues that Gardens Alive breached their contract by refusing to pay Arett a bonus based on the formula proposed in Cooper's email (10% of the "first year savings" times three). R. 27-9, Pg. ID 905. Gardens Alive doesn't dispute that it agreed to do so. But under these circumstances, that's not enough.

To form a binding contract, the parties must not only agree on the "essential terms," but those terms must be "reasonably certain and clear." *Bank of N.Y. Mellon v. Rhiel*, 122 N.E.3d 1219, 1225 (Ohio 2018); *see also* 1 Richard A. Lord, Williston on Contracts § 4:21 (4th ed.). This latter requirement enables courts to craft appropriate remedies based on the parties' intent as manifested by the written words of the contract. *See Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003); *First Nat'l Bank of Omaha v. iBeam Sols., LLC*, 61 N.E.3d 740, 762 (Ohio Ct. App. 2016).

So the question here is whether "first year savings" is reasonably certain and clear such that the district court (or a reasonable jury) could craft an appropriate remedy based on the agreement. On one hand, every middle schooler with a piggy bank knows what "savings" means. And the term is readily defined in any dictionary. *See, e.g.*, *Savings*, *Webster's New World College*

*Dictionary* 1194 (3d ed. 1996) ("any reduction in expense, time, labor, etc."). But under Ohio law, the intent of the parties as manifested by the written agreement trumps a term's typical meaning. *See Galatis*, 797 N.E.2d at 1261.

And here, the parties' discussion of "savings" shows they meant for it to have a particular meaning—which they intended to agree on later. Cooper's offer letter to Arett expressly stated that the details of the bonus would be provided separately. And Cooper's accompanying email said that he'd look to Arett for an "initial proposal" on the key metrics to measure "savings," and the two of them would "work out in good faith" exactly how the calculation would be made. R. 27-9, Pg. ID 905. In this way, the parties acknowledged that they were temporarily leaving the meaning of "savings" undefined. So rather than agreeing on a "reasonably certain and clear" term, they agreed to negotiate the term's meaning in the future. *Rhiel*, 122 N.E.3d at 1225.

In other words, the parties made an "agreement to agree." *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 207–08 (Ohio 1994); *see also* Omri Ben-Shahar, *"Agreeing to Disagree": Filling Gaps in Deliberately Incomplete Contracts*, 2004 Wis. L. Rev. 389, 395 (describing how parties sometimes "affirmatively acknowledge the indefiniteness of their agreement and state their intent (or hope) that further negotiations will enable them to reach a more complete agreement"). But agreements to agree are rarely enforceable. That's because the parties' intent controls the contractual meaning. And when the parties intend to leave undefined an essential term subject to further negotiations, no binding contract is formed. *See Sweeney*, 634 N.E.2d at 208.

That's exactly what happened here. "Savings" is an essential term of the bonus agreement. After all, it's the main input for the proposed formula. And the parties intended to negotiate the metrics that would give "savings" meaning later. Given these undisputed facts, no reasonable jury could find the parties agreed to a "reasonably certain and clear" meaning of the term. *Rhiel*, 122

N.E.3d at 1225. Thus, there was no bonus contract; Gardens Alive wasn't bound to pay Arett anything.

Arett argues that defining "savings" is relatively easy, and thus the term is sufficiently definite. According to Arett, the relevant savings can be measured either by the reduced labor costs (units per hour, for example) or by Gardens Alive's own records of estimated and actual costs for Arett's projects. He argues that any disagreement about whether these metrics are appropriate is a factual dispute for the jury.

But a jury can't make factual findings that contradict the express terms of the agreement. *See Galatis*, 797 N.E.2d at 1261–62. And here, the parties expressly agreed to leave the term undefined subject to further negotiation. So any proposed understanding of "savings" would inherently conflict with the contract's express terms. As a result, the parties did not agree to essential terms for the bonus provision that are "reasonably certain and clear." *Rhiel*, 122 N.E.3d at 1225. So it's unenforceable.

This case resembles *Christensen v. Ohio Mulch Supply, Inc.*, No. 00AP-1036, 2001 WL 910110 (Ohio Ct. App. Aug. 14, 2001). In that case, the parties agreed to pay the plaintiff a bonus of "10% of retail profit [d]etermined by the formula agreed upon between the both of us." *Id.* at *5. The plaintiff suggested "profit" meant "sales less expenses," but the parties never explicitly discussed this understanding or had any subsequent conversation about the bonus formula. *Id.* The Ohio Court of Appeals found that this agreement didn't provide the factfinder with any guidance on which metrics were to be used to determine the "retail profits." So the court held that "no 'formula' was ever agreed upon that would be sufficiently clear to be enforceable." *Id.* So too here.

Arett tries to distinguish *Christensen* by arguing that, unlike the *Christensen* parties, he and Cooper did agree to a bonus formula: 10% of the first-year savings times three. But by these standards, so did the *Christensen* parties: 10% of retail profits. The fact the *Christensen* parties explicitly stated that "the formula" for determining retail profits would be determined between them both is no different from what happened here: Cooper said he'd look to Arett for an initial proposal on savings metrics, and the two would decide how the calculation would be made. In both instances, the parties left an essential term of the formula ("retail profit" in *Christensen*; "first year savings" here) uncertain subject to further negotiations. So it follows in both instances that the bonus agreements are unenforceable. *See id.*

We affirm the district court's grant of summary judgment for Gardens Alive on Arett's breach-of-contract claim.

III.

Arett next argues that even if the contract's bonus provision is unenforceable, Gardens Alive still owes him a bonus based on promissory estoppel. To recover under promissory estoppel, Arett must start by showing that Gardens Alive made him a promise that is "clear and unambiguous in its terms." *Cohen & Co. v. Messina*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985). Arett suggests that Gardens Alive made him two promises: (1) to pay him a bonus using the formula outlined in Cooper's email; and (2) to negotiate in good faith any dispute about how to calculate savings. But neither promise is sufficiently "clear and unambiguous" to be legally enforceable.

The first promise—to pay Arett a bonus using the proposed formula—suffers from the same flaw as Arett's breach-of-contract claim. That is, it leaves an essential term—"savings"—subject to further negotiations. Because the parties never settled on how "savings" would be calculated, the promise's terms aren't "clear and unambiguous." *Messina*, 492 N.E.2d at 872. Thus, Arett can't sue to enforce this promise.

The second promise—to negotiate metrics for calculating "savings" in good faith—is also unenforceable. This promise is an "agreement to agree"—it requires further negotiation by the parties. Whether based on a promise or an actual contract, an "agreement to agree" is enforceable only when the terms are "sufficiently definite to be specifically enforced." *Sweeney*, 634 N.E.2d at 208 (citation omitted). But Arett provides no guidance for what enforcement of this promise would look like. What does it mean to negotiate in good faith? What is the remedy for failure to do so? And why doesn't Gardens Alive's $12,000 proposal fulfill this promise? Given these unanswered questions, this promise isn't definite enough to be enforced. So Arett can't recover based on promissory estoppel.

## IV.

Finally, Arett argues that Gardens Alive was unjustly enriched by not paying him a bonus. Unjust enrichment occurs when a party "retains money or benefits which in justice and equity belong to another." *Hummel v. Hummel*, 14 N.E.2d 923, 927 (Ohio 1938). To recover under this theory, Arett must show that (1) he conferred a benefit on Gardens Alive, (2) Gardens Alive knew about that benefit, and (3) Gardens Alive kept the benefit though it would be unjust to do so without paying Arett. *See Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005).

As an initial matter, Gardens Alive argues that Ohio law bars unjust-enrichment claims if a contract between the parties covers the same subject. But as explained above, the parties don't have a valid contract for the bonus provision. Thus, Arett isn't prohibited from recovering for unjust enrichment on this basis. *See Pohmer v. JPMorgan Chase Bank, N.A.*, No. 14AP-429, 2015 WL 1432546, at *7 (Ohio Ct. App. Mar. 31, 2015).

Turning to the merits of the claim, this case turns on the third element: whether it would be "unjust" for Gardens Alive to retain the benefit of Arett's savings without paying him a higher

bonus. In considering whether it would be unjust, Ohio courts look to whether the defendant is responsible for the plaintiff's "detrimental position." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 502 (6th Cir. 2003) (quoting *U.S. Health Pracs., Inc. v. Byron Blake, M.D., Inc.*, No. 00AP-1002, 2001 WL 277291, at *2 (Ohio Ct. App. Mar. 22, 2001)); *see also Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 776 (6th Cir. 2014). Here, that means considering whether Gardens Alive is responsible for Arett's lower compensation.

But Arett can't show that Gardens Alive is responsible for any benefit it retained. After all, Arett never submitted an initial proposal for how to calculate "savings" as requested by Cooper's email. Nor did he even broach the topic of a bonus until after he was fired. Given these facts, Arett alone is responsible for the difficulty calculating his bonus. Accordingly, it was not "unjust" for Gardens Alive to refuse to pay him a higher bonus.

Arett suggests that *Quesnell v. Bank One Corp.* mandates a different outcome. No. 01AP-792, 2002 WL 500506 (Ohio Ct. App. Apr. 4, 2002). We disagree. In that case, the defendant-bank told the plaintiff-employee that it would pay her a bonus under an incentive-compensation plan that applied to all employees in certain roles. *Id.* at *1–2, *6. The plan outlined how the bonus would be calculated (based on a percentage of fees generated from clients referred to the bank by the employee). *Id.* at *1. But when she tried to collect her bonus, the bank said that she was ineligible for the incentive-compensation plan. *Id.* at *8. The Ohio Court of Appeals held that it was unjust for the employer to retain the benefit of the plaintiff's work without paying her a bonus under these circumstances. *Id.*

But this case meaningfully differs from *Quesnell* on several fronts. First, the *Quesnell* plaintiff wasn't responsible for the nonpayment of her bonus. According to the incentive-compensation plan, all the plaintiff needed to do was refer clients to the bank. Once she did that,

her bonus could be calculated based on the fees generated from those clients. In contrast, Cooper's email tasked Arett with submitting an "initial proposal" on how to measure savings, a key input in the bonus formula. Yet he didn't do so. Arett is thus responsible for the difficulty calculating his bonus.

Second, the bonus formula in *Quesnell* was clearly defined. Indeed, the incentive-compensation plan outlined the relevant input—fees generated by client referrals. And the same formula applied to all employees in certain roles at the bank. The plaintiff had even been paid according to this formula in the past. *Id.* at \*2. So the *Quesnell* employer had experience calculating bonuses in this way, making nonpayment of the plaintiff's bonus unjustified.

The same isn't true here. The negotiations over Arett's salary led the parties to replace Arett's existing bonus structure with a new one. And because Arett never sent an "initial proposal" for how to measure "savings," the key metric for calculating the bonus remained unclear. That left Gardens Alive without a reliable way to calculate Arett's bonus in the first place. The magnitude of not agreeing on metrics to calculate "savings" is highlighted by the substantial difference between Gardens Alive's $12,000 estimate and Arett's $500,000 estimate. In contrast, the *Quesnell* employer could calculate the plaintiff's bonus to a tee.

Given the uncertainty of Arett's new bonus formula, and his own role in making it that way, it was not "unjust" for Gardens Alive to refuse to pay Arett a higher bonus. Otherwise Arett would benefit from his own shortcoming. The district court correctly granted summary judgment in Gardens Alive's favor.

\* \* \*

We affirm.